44 C.C.P.A. (Patents)

**HENRY A LA PENSEE, Inc., Appellant,**

v.

**SOCIETE A RESPONSABILITE LIM- ITEE HENRY A LA PENSEE,** Appellee.

**Patent Appeal No. 6226.**

United States Court of Customs and Patent Appeals. April 10. 1957.

Jack M. Ginsberg, New York City, for appellant.

Maxwell E. Sparrow, New York City, for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON retired, Associate Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Assistant Commissioner of Patents (104 USPQ 119) acting for the Commissioner, reversing the decision of the Examiner of Trade-Mark Interferences and dismissing a petition by Henry a la Pensee, Inc., appellant here, to cancel appellee's 1905 Act registration No. 443,-582, granted November 29, 1949 for "Henry a la Pensee" as a trademark for certain clothing. Appellee asserted ownership in its application for registration of a French registration of the trademark dated February 21, 1935, No. 237,-376.

There is no real dispute as to the essential facts which, as shown by the record, appear to be as follows:

Appellee, respondent in the cancellation proceeding, is a French corporation, which, for some years prior to 1937, operated a de luxe retail clothing store in Paris, France. The operating heads of the French company, at all times pertinent to the present case, have been Pierre E. Massin de Miraval (hereafter called Pierre, in accordance with the nomenclature adopted by the Commissioner and followed by the parties in

their briefs here) and his nephew Jean Lefebure (hereafter called Jean).

In 1937 Pierre and Jean decided to open a retail outlet for their goods in New York City and for that purpose, Henry a la Pensee, Inc., a New York corporation, the appellant here (hereafter referred to as the New York company), was formed, all of its stock originally being owned by Pierre and Jean. Alice Schwünbold (hereafter called Alice) was employed to manage the New York store. Pierre and Jean were officers of the New York company and both drew salaries as such.

On February 1, 1938 an agreement was entered into between the French and New York companies, under which the former granted to the latter the exclusive right to use its name within the United States, and to adopt that name as its corporate title. The agreement also granted to the New York company the exclusive right to purchase and sell the goods of the French company in the United States, and the New York company agreed not to handle, sell or trade in any other merchandise than that produced and sold to it by the French company. The New York company commenced to do business in March 1938.

In May 1938 the French company ceased manufacturing operations which were transferred to Comptoir Parisien D'Achat Halp (hereafter referred to as the export company), an affiliated corporation having the same address, of which Pierre was the "administrator."

On January 5, 1939 Pierre and Alice were married.

On February 1, 1939 a second agreement was executed by the New York company, the French company, and the export company, and the 1938 contract above referred to was canceled. The new agreement confirmed the former grant by the French company to the New York company of the exclusive right to use its name and to adopt the same as its corporate title within the United States, and then *irrevocably* granted that right to the New York company.

The New York company, by the second or 1939 agreement, agreed to deal only in goods of the export company, except by written consent of that company to deal in other merchandise, while the export company therein agreed to sell its merchandise in the United States exclusively to the New York company, to execute all orders from that company and to manufacture and produce the merchandise under the trade name "Henry a la Pensee." The agreement recited that that name of the French company had acquired, through its having been established in Paris for one hundred and thirty-five years, a reputation which made it essential that all merchandise manufactured by the export company bear the words "Henry a la Pensee" and that the merchandise being at that time manufactured by the export company was identified by those words. The New York company also agreed to maintain a store in New York comparable to that maintained by the French company in Paris, to sell all its merchandise marked with the trade name of Henry a la Pensee and to include in its advertisements the address of the French company in addition to the name of the New York company. The French company agreed similarly to advertise the New York company.

Beginning in 1940, as a result of the war in Europe and after the sinking of the steamship Champlain, the New York company was unable to obtain goods from France, and accordingly began to market goods of its own using labels bearing the words "Henry a la Pensee, Inc.," with "Inc." in relatively small letters, and this it continued to do. Prior to that time, it would appear that the labels on the goods sold by the New York company, being imported from the French company, read "Henry a la Pensee, Paris" and that after 1940 they read "Henry a la Pensee, Inc." when used on merchandise otherwise obtained. Alice testified that Pierre, who had been mobilized, encouraged her to keep the New York store going and said that she had had "quite a few talks" with him about

it. She said he was fearful that the Paris store would not be able to remain open.

In December of 1941 Pierre resigned as president of the New York company. He and Alice separated in 1943 and were divorced December 3, 1946. At some time prior to 1947 Alice became the owner of seventy-five per cent of the stock of the New York company and in 1950 she acquired the remaining twenty-five per cent from Jean. When the petition for cancellation was filed she signed it as president of the New York company.

On January 3, 1947 the New York and French companies, the export company, Pierre, Alice and Jean all entered into a new and third agreement settling some financial matters and providing *inter alia* that:

"Par. 5. With the exception of the provisions contained in the above referred to agreement of February 1, 1939 relative to the exclusive right of the New York corporation to use the name 'Henry a la Pensee', said agreement is hereby canceled as of the date hereof. CPA [the export company] and HALP [the French company] confirm the exclusive right of the New York Corporation to use said name as a part of its corporate title and generally in connection with its business *and in connection with merchandise sold by it; provided, however, that where such name is used by the New York Corporation on labels attached to or otherwise directly in conjunction with merchandise other than that purchased from CPA or HALP it shall be used in conjunction with the abbreviation 'Inc.'* or other appropriate corporate designation. [Emphasis ours.] CPA, HALP, PM [Pierre] and J.L. [Jean] undertake not to use or to permit anyone other than the New York Corporation to use said name in connection with any business conducted in whole or in part within the eastern half of the State of Pennsylvania or in the States of New Jersey, New York or Connecti-

cut, which area is hereinafter referred to as the 'New York Area'. The New York Corporation agrees, however, to permit others who shall have purchased merchandise from CPA or HALP outside the United States to use said name in connection with the resale of such merchandise outside the New York Area but not in connection with the manufacture or sale of merchandise made or processed in the United States by anyone other than CPA or HALP.

"Par. 6. Before offering any merchandise to others for resale in the United States, CPA and HALP shall give the New York Corporation reasonable opportunity to purchase at prices and on terms and conditions at least as advantageous as those offered to others all such merchandise as they or either of them may offer for sale or be in a position to sell or export to the United States. *The New York Corporation shall be bound to purchase only such of said merchandise as it shall select at prices and on terms and conditions agreed upon by it.* [Emphasis ours.]

\* \* \* \* \* \*

"CPA and HALP agree not to sell or permit to be sold to others, for resale in the New York Area, any merchandise substantially identical with that purchased from them or either of them by the New York Corporation but they shall be free to sell any merchandise to others for resale outside the New York Area."

The application for the trademark registration here sought to be canceled was filed on September 13, 1946, about 3½ months prior to the date of the 1947 agreement, from which we have just quoted, and the registration issued to the French company on November 29, 1949, under the Act of February 20, 1905, no effort having been made to bring it under the 1946 Act, 15 U.S.C.A. § 1051 et seq. which was then in effect.

From May 15, 1950 through August 31, 1953, the French company sold $240,-

722 worth of goods bearing its trademark to purchasers in the United States, most of those sales being made directly to consumers who were located throughout the country.

Alice testified in May 1953 that the New York company had during the last few years reached an annual volume of about $200,000; and that some wholesale sales had been made in Boston, Dallas, and Chicago, while the retail business of the company included shipments of merchandise outside New York.

On the basis of the foregoing facts, the Examiner of Interferences held that the 1947 agreement gave appellant the unlimited right to use the name "Henry a la Pensee, Inc." on goods derived from any source other than the appellant, without reserving to the appellee any right to control the quality or character of such goods, and that that name is substantially indistinguishable from the registered mark, "Henry a la Pensee" since the notation "Inc." is incapable of distinguishing goods of one trader from those of another as far as the public is concerned. He accordingly found that, when the registration here involved was granted, the appellee "was no longer the owner of the mark in question with the exclusive right to use the same at the time the registration issued," and that the registration should be canceled.

The Commissioner reversed, finding that the French company owns the trademark "Henry a la Pensee," that its failure to use that mark during the war was an excusable non-use, that the use of the mark by the New York company to identify the goods of the French company was not a trademark use and vested no trademark rights in the New York company, that any rights which that company might have in connection with "Henry a la Pensee" arise out of the 1947 contract and not from the trademark laws, and that the French company had the right to register and maintain the registration of the mark. The Commissioner further found that the appellant had failed to establish any facts from which damage can be presumed, and accordingly held that the registration should not be canceled.

At the outset there is a question of what statutory law applies to this case. The registration here involved was granted under the Act of 1905 and accordingly, as provided by section 46(a) of the Trade-Mark Act of 1946, the validity of the registration and rights and remedies thereunder are to be determined under the 1905 Act "except as provided in sections 8, 12, 14, 15 and 47" of the 1946 Act. Of the sections enumerated only section 14, which relates to cancellation proceedings, and section 47 are in any way pertinent to the present situation. Section 14, however, places no restriction on the cancellation of a registration granted under the 1905 Act unless there has been a publication thereof under the provisions of section 12(c) of the 1946 Act. No such publication has been made in the present case and the validity of the registration must accordingly be determined under the 1905 Act. See Schnur & Cohan, Inc., v. Academy of Motion Picture Arts, etc., 223 F.2d 478, 42 C.C.P.A., Patents, 963. Section 47(a) provides that if an application pending when the 1946 Act came into effect is not brought under it by amendment, the case here, the registration shall be granted in accordance with the Act under which it was filed.

Section 5 of the 1905 Act provides that no mark shall be registered "which consists merely in the name of an individual, firm, corporation, or association, not written, printed, impressed, or woven in some particular or distinctive manner." This is the so-called "name clause" which was omitted from the 1946 Act. It has been consistently held that the quoted provision precludes registration of a trademark which does not differ materially from the name of a corporation existing on the date of application for registration. Haskelite Manufacturing Corp. v. Plymold Corp., 162 F. 2d 464, 34 C.C.P.A., Patents, 1172; Skol Co., Inc., v. Olson, 151 F.2d 200, 33 C.C. P.A., Patents, 715; Kroll Bros. Co. v. Rolls-Royce, 126 F.2d 495, 29 C.C.P.A.,

Patents, 897; Eversharp Pencil Co. v. American Safety Razor Corp., 54 App. D.C. 315, 297 F. 894; Beechnut Cereal Co. v. Beech-Nut Packing Co., 51 App. D.C. 5, 273 F. 367.

■ It is apparent from the above statement of facts that at the time when appellee, the French company, applied for registration of the trademark "Henry a la Pensee," those words formed the essential portion of the name of the New York company, so far as distinguishing goods sold by that company was concerned. This court held in Holly Molding Devices v. Esquire, Inc., 148 F. 2d 355, 32 C.C.P.A., Patents, 935, that "Inc." must be ignored in considering this question, a point which had long been settled on the theory that "Inc." does not serve to identify any corporation in particular.

■ It is true that, at the date of application for registration, the 1939 contract by which the New York company agreed to handle only the export company's merchandise had not been canceled, but, as a matter of fact, the New York company, between 1940 and 1946, had been handling other merchandise, with full knowledge of the French company, and its right to do so, and to apply to such merchandise the words "Henry a la Pensee, Inc.", was confirmed by the 1947 agreement, executed about 3½ months after the application was filed. Under such circumstances, the appellee's contention that the New York company was but "an arm of the French company" at the time of filing of the application cannot be sustained. The New York company was, in fact, an independent enterprise notwithstanding the 1939 agreement. Accordingly the provision of section 5 of the 1905 Act, relied on by the French company which permits registration of "the name of the applicant or a portion thereof" is not applicable here. This provision is a modification of and virtually a part of the "name clause" and permits a corporation to register its *own* name (though it is *the* name of a corporation) as a trademark if it is "otherwise registrable."

■ The difficulty in this case arises from the fact that "Henry a la Pensee" is *both* the name of the applicant and the name of *another* corporation which it created. If the French company had kept control of Henry a la Pensee, Inc. in accordance with the terms of the 1938 and 1939 agreements so that it sold no merchandise under the trademark in question except that of the French company, which was unquestionably on this record the original owner of the trademark, we then would be able to see identity between the French and New York companies and perhaps consider the latter to be merely the arm of the former. The facts in this case show, however, that the French company created the New York company, gave it a name which incorporated its trademark, made the right to use this name irrevocable in 1939, and required it to use that trademark on all merchandise it sold, which merchandise was initially required to be obtained from the French company or its affiliate. It then, because of the war, permitted it to sell merchandise acquired elsewhere marked with "Henry a la Pensee, Inc." for several years before applying for registration of the mark. The only restraint imposed was the inclusion of "Inc." in the marking where the merchandise was not obtained from the French company. This would appear to have been a parol modification of the 1939 agreement as of some time in 1940 which was confirmed explicitly in the 1947 agreement. Alice testified that she acquired 75% of the stock of the New York company "shortly after" it was formed, so that the French company did not even have stock control of its one time affiliate when it filed its application for registration in 1946.

Under these circumstances it seems clear to us that the mark registered under the 1905 Act was in fact *another's* corporate name, albeit that corporation, in its genesis, was a creation of the registrant. Since the involved corporation and the applicant were not the same entity, the proviso of Sec. 5 of the 1905 Act making an exception in favor of "the

name of the applicant" is, as we have said, not applicable.

██ Furthermore, it has many times been held that it is immaterial, in applying the "name clause," that the corporate name was in *prior* use as a trademark by the applicant or registrant, that is before the date of incorporation. Haskelite Manufacturing Corp. v. Plymold Corp., supra; Derenberg "Trade-Mark Protection and Unfair Trading," Sec. 56 and cases there cited.

It follows that appellee's registration should not have been granted by reason of the "name clause" prohibition of Sec. 5 of the 1905 Act.

██ We are unable to agree with the holding of the Commissioner that appellant (the New York company) has failed to establish any facts from which damage can be presumed. Appellant is engaged in a business which includes the sale of the very goods for which appellee's trademark was registered, and that trademark forms the significant part of appellant's corporate name. Under such circumstances, damage will be presumed without proof that it has actually occurred. Haskelite Manufacturing Corp. v. Plymold Corp., supra; Asbestone Co. v. Philip Carey Mfg. Co., 41 App.D.C. 507. The fact that appellant and appellee were not in actual competition when the registration was applied for does not remove the presumption of damage. As was said in the Asbestone case, supra:

"It follows that, where the name of an 'individual, firm, corporation, or association' is sought to be registered, as in this instance, the right of opposition is statutory, and proof of actual damage is not required. Neither is it important that appellant has not engaged actively in the business for which it was alleged it was incorporated. It is not the business which the statute in this particular aims to protect. It is the corporate name, and it is sufficient that possible damage may be inferred from invading the property right which the corporation possesses in its name."

For the reasons given, we are of the opinion that the registration here involved was inadvertently granted in contravention of the provisions of the Trade-Mark Act of 1905 and that it should, therefore, be canceled. The action of the Examiner of Trade-Mark Interferences in sustaining the petition for cancellation and recommending that the registration be canceled was therefore proper.

██ It must be remembered that we are here concerned only with the French company's right to *register* its mark in the United States. Under Sec. 33(a) of the 1946 Act, a registration under the 1905 Act "shall be *prima facie* evidence of registrant's exclusive right to use the registered mark in commerce on the goods * * * specified in the certificate * * *." It is clear to us that appellee did not have such an *exclusive* right, on the facts presented in the record before us, at the time it obtained its registration in 1949. By its own conduct and agreements, it had previously given to the petitioner-appellant, a corporation no longer under its control and bound to it only by contract, the right to use the trademark on *any* merchandise, qualified only by the condition that "Inc." be used with it. Within the "New York Area" that right of appellant was exclusive. It may well be, as the Commissioner held, that these rights of appellant did not arise "from the trademark laws," but regardless of how they arose, they were and are inconsistent with registration of the mark by the French company. Neither do we deem it to be important that the *non*-use of the mark by the French company during World War II was excusable. What counts here is the *use* of the mark by the New York company and its rights thereto, which are in no way dependent upon the non-use by the French company. We agree with the Examiner of Interferences that appellee gave appellant the right to use a mark which is indistin-

guishable, as an indication of origin, from the mark it reserved to itself.

The decision appealed from is reversed.

Reversed.

JACKSON, J., retired, recalled to participate herein in place of COLE, J., absent because of illness.